May it please the Court, my name is Bob Diggs and I represent American Trucking Associations, the appellant in this case. I would like to reserve two minutes for rebuttal. Alright. This case involves the Port of Los Angeles' concession agreement program. The concession agreements are really a comprehensive set of regulations that control virtually every aspect of a motor carrier's operation at the Port of Los Angeles. The Court below at one stage likened this agreement to a licensing scheme and that's exactly what they are. The Port licenses which motor carriers may compete at the Port and then they license virtually every aspect of their business while competing at the Port. Many of the regulations are not an issue in this case. In fact, most of them aren't. Most of the regulations simply duplicate existing federal state or federal state safety and security and environmental regulations and they're not at issue. There are only five primary provisions of the concession agreements that are at issue. Four of them are being challenged under the rates, routes, and services preemption provision and one, the placarding provision, is being challenged under a separate provision. The four that are being challenged under the rates, routes, and services provision are the independent contractor ban, the off-street parking requirement, the financial capability provision, and the maintenance provision. There's also another issue in this case dealing with whether the Port has the discretion to revoke the authority to operate in the Port under safety grounds of a motor carrier or whether that authority is reserved solely to the Department of Transportation. I'd like to begin with the rates, routes, and services preemption claim and the four provisions that we believe are subject to preemption under that claim. Sometimes it's during these arguments where you've laid out the issues which I seem to agree with where I'd love to have the opportunity to just turn over and say, you agree those are the issues but I'm not going to. I'm just suggesting I think you've adequately selected the issues. With respect to the rates, routes, and services claim, there's really three sub-issues involved. The issues are whether or not those four provisions fall within the scope of rates, routes, and services, and if they do, the second issue is whether they are protected from preemption by the safety exclusion, and then the third issue is if they fall within the provision, are they protected from preemption by the non-statutory market participant doctrine. Is that the same, proprietary, is that the market participation? Yes. Is there another word for that? Is it a proprietary function? It is referred sometimes as proprietary. Thank you. I want to very briefly address the issues related to the scope of preemption. The court found that the independent contractor ban and the off-street parking requirement did fall within the scope of preemption of the statute. However, the court found the financial capability provision and the maintenance did not fall within the rates, routes, and services provision. And by the way, the court did not cross-appeal the issue on the independent contractor and on the off-street parking. We believe that clearly those provisions that the court found not within the scope of the plan are within the scope of rates, routes, and services provision. In the Roe case, which is the most recent case, in many cases the courts have described congressional intent in this area as being the broadest possible type of preemption. Anything that affects a motor carrier's rates, routes, and services, anything that is connected with the rates, routes, and services, anything that's related to them. And, Your Honors, nothing can be more fully impact a motor carrier's rates, routes, and services than being shut out of a market and having no ability to compete in that market. The financial capability provision is a tool by which the port can shut a motor carrier out of the Port of Los Angeles. Well, there's no question, getting to that issue, that it does give unfettered authority to deny the trucks access to the port. But, as I read it, as I read through this, I don't find any evidence the port has ever denied even one of 16,000-plus drage operators. It doesn't have to at this point. This is, it basically gives them the ability. What they've done in the past doesn't mean what they're going to do in the future. Well, I guess we're talking about, aren't we really talking about a standard review now? We're talking about tenuous and remote. Seems to me that that makes it pretty tenuous and remote. It's so easy to get to what you have to do on financial capability that I'm trying to figure out how I get around tenuous and remote. Financial capability is not easy. They have to turn over SEC records, tax returns, credit reports, anything that the port asks them for, and it is completely discretionary. There are no standards by which the port determines financial capability. It's completely up to the commissioner of the port to decide whether or not there is financial capability. You have to remember that when they started this program, the port said that the object of the program was to reshape the economics of the drage industry. They wanted fewer motor carriers. They wanted only larger motor carriers to operate, and they wanted motor carriers who, in their view, were more stable. This, as the court in the earlier stages of this case, this court said, is pure economic regulation, and direct economic regulation certainly falls within the scope of the rates, routes, and services preemption provision. You haven't mentioned the concern about air pollution with what they were seeking to do. You haven't mentioned that. They were seeking to address air pollution. That's not at issue in this case. There are environmental regulations. There are a whole host of, there's a truck retirement program. None of that is being challenged in this case. What about the maintenance provisions? The maintenance provision, there are a substantial number of federal maintenance provisions, and none of those are at issue in this case. There's only one unique provision that we are challenging, and that is that manufacturers have to, excuse me, that motor carriers have to maintain trucks to manufacturer specifications, and part of that means that they have to use manufacturer replacement parts. Now, a truck isn't like a car. A truck, even a new truck, has parts from many different manufacturers, and it's an extreme administrative burden to try to track where each of those parts came from and to replace those parts only with a certain manufacturer's parts. It's much easier and less costly for a motor carrier to use aftermarket parts that are considerably less expensive. So because this unique provision affects motor carriers' costs, it indirectly reflects, excuse me, affects motor carriers' prices, and therefore we believe certainly falls within the preemption provision. However... Now, do the manufacturer's instructions require that they use their parts? No, they do not. I believe... So, if they maintain their trucks to an acceptable standard under the manufacturer's protocol, they can use parts from anywhere, is that right? That's correct, Your Honor, and in fact, certainly, as I said, there's a very comprehensive set of Federal Motor Carrier Safety Administration regulations on maintenance, and any motor carrier can use a part that is a non-manufactured part, and that's perfectly acceptable. It's only with respect to this, and this leads me into the next issue in this case is... Well, let me ask you... Before you go to the next issue, I'm not sure I quite understand why you're objecting to this provision that requires a maintenance that is to the manufacturer's standard. That, I would think, is a safety concern, and it ought to be upheld. Your Honor, we, first of all, just in terms of whether it's covered, we believe it creates an administrative burden and an excessive cost to the motor carriers. Now, in terms of whether or not it is a safety provision, remember that under this statute, in order for a provision to relate to safety, it has to be adopted by the government entity with a genuine safety concern in mind to address that safety concern. Again, there is nothing in the record that reflects that there is a safety concern with using non-manufactured parts. Indeed, what I believe this provision was intended for was the emission equipment and the maintenance of the emission equipment. This standard was not adopted to address any specific safety concern, and we don't believe it is needed to address any safety concern, so we don't believe that it is covered by the safety exception. Well, I'm going to go one step back. Even if I suggest there's some connection which exists between maintenance standards and dredge services, it doesn't seem to me like the maintenance provision goes directly to the frequency of scheduling your transportation, the selection of markets to and from, to or from which transportation is provided, or prices charged to terminal operators. Now, to me, that's what air transport leads me to think I have to look at, and so I guess I'm trying to have you address that. Well, Your Honor, basically, it's very clear that you don't have to have a direct impact. You can have an indirect impact on prices, routes, and services in order to run afoul of this provision. You've got to have more than an indirect remote and tenuous. We believe this, and again, that's a question for this Court to decide. We believe it's far from remote and tenuous because it does substantially increase the prices. Your Honor, I'd like to move on now to what I think is the crucial issue in this case, and it's the application of the Court below by the market participant doctrine. And under the market participant doctrine, the Court found that all four of these challenge provisions are saved from preemption. I want to begin by saying that when you're looking at preemption, as this Court has found in many decisions, you have to look at it, excuse me, the market participant doctrine, you have to look at it in the context of the preemption to which it's being applied. And in this instance, we have an express preemption provision which has delineated and limited numbers of exceptions to it. We're not talking about a dormant commerce clause case. We're not talking about an implied preemption case where the market participant doctrine could have a broader application. We're talking about an instance in which, under the rates, routes, and services, the market participant doctrine ought to be applied in the narrowest possible terms, if at all. And here, we believe the judge below did just the opposite of that. This has been applied in the broadest possible terms. With respect to actually how the judge decided this case, first of all, there are two primary issues. How do you define the market involved? And should that market be defined narrowly? And what does the government entity have to be doing in that market? Does the government entity have to be directly participating in the market as the precedent teaches? Well, first of all, in terms of defining the market, we don't think the judge really defined the market appropriately. The cases say you need to define the relevant market and that that definition should be narrowly made and that if it's not narrowly made, the exception will swallow the rule. There's some argument, and we would rely on our briefs, by the state that the Wonecki case is not a solid precedent because it's a plurality opinion. We believe the Wonecki case has been adopted by this court and by several other circuits and that it is good precedent and that its narrow application should be followed. Here, and if you narrowly apply the market concept, the market that's at issue here is the dredge market. Admittedly, the court is not buying or selling dredge services. That ought to be the end of the inquiry. The market participant doctrine shouldn't apply. But the court didn't end the inquiry like that. The court, again, without really defining what market it was talking about, sort of talked about the port in terms of the port services market. And here, Your Honor, I think the court got confused as to the term proprietor. I think you can be a proprietor. I mean, in a lot of instances, a lot of government entities do the same sort of things. They're trying to attract business to their jurisdiction. They're trying to increase their revenues, their tax proceeds. You can be a proprietor. You can have these interests without being a direct participant in a relevant market, and that's the problem that we have here. The court's decision here illustrates the swallowing of the rule. The court basically said, well, they are running a port business. And anything that affects the economic interest of the port is done in the terms of the ports being a market participant. So anything that could possibly affect their financial interest that they're doing to increase their economic interest, the court below said, is the act of a market participant. So things as far afield as securing goodwill of the community, avoiding litigation or lowering regulation costs or making regulation more efficient, all because it would have an economic impact on the port, the court below said, this is part of, these are the acts of a market participant. We think that broad application is clearly wrong. It's hard to imagine under that analysis anything the port could do that ultimately wouldn't have some tie-in to its economic interest and wouldn't be covered. The other issue is I don't think the court, I think the court read out of the market participant doctrine the idea that you have to be a participant. In all of the cases, the government entity in which the market participant doctrine has been applied, the government entity is actually participating in the market, actually has a contractual relationship in the market. Here the court said the government, the port didn't have to be securing anything, that it just had these general interests in it. Well, these general interests are regulatory in nature. Can I just ask on that? Sure. The port runs the pull-out or whatever the acronym is. They run that port. They attract boats, ships to come in and unload, boats to load up and leave. They run that port in and out. They get money for everything they do. They don't pay. They don't have any way of supporting themselves except from their operations. The city doesn't support them. Taxpayers don't support them. They support themselves. So their business is running that port. I don't understand how you can say that that's not a proper scope of the proprietary interest of the Port of Los Angeles. I mean, how can you say that the only thing that's proprietary is their little concessionaire's scheme of agreements where they make contracts with the concessionaires, the truckers' owners, the owners of the trucking companies, and that's the only thing they can do, and only concerning dredge trucks to move stuff around on the property. That seems to me extremely artificial. I mean, the port handles billions of dollars of money coming in and going out that has nothing to do with the concessionaires. Aren't they in a proprietary business of running that whole port? They are in a business of running the port, but that doesn't invoke the market participant, Doctor. As I said, any government entity is trying to attract business. It's trying to increase its tax base. Here the port has the ability to levy fees. In fact, most of the monies that it's spent in terms of this are through a container fee. It has raised tens of millions of dollars. It gets state monies, the Proposition 1B monies. So the port has the ability to raise monies. The port has regulatory authority, and in the safety area, in the environmental area, it can regulate, and that's what it's doing here. But the mere fact that it's running a business, as in the Arrow Ground decision, the mere fact that it has financial interests, that it's running its own business, doesn't mean that it has unfettered discretion. Remember, we're sitting on a channel of interstate commerce. The port has the ability to have, if you allow the port, because it's a proprietor, to escape federal preemption, and again, it's hard to imagine anything that would be preempted, they can erect tremendous barriers to interstate commerce. It's clear that when the Congress passed these laws, passed the Airline Deregulation Act, which, by the way, has a proprietary exception that the Motor Carrier Act does not have, that when they did that, they knew that these ports were channels of interstate commerce. It's the biggest port in the nation, but they want free access to be able to impede upon motor carriers' activities in order to meet their own economic or political needs, and they simply don't have that right. In terms of the market participant doctrine, as I said, I think the court got it wrong in saying that there didn't need to be some direct contact between the port and the ____. In every case, it's either been buying or leasing services, excuse me, buying or selling goods or services or leasing facilities or government property. I don't have time to go through all the cases, but every one of those, the one case that the court cited, the scrap case, and I would like to cite to that court, they said, in the Alexandria scrap case, that shows that the port doesn't have to be a purchaser. Well, in describing the issue that the port was taking on in terms of that, they said, the court described what it was considering was, for the first time, it was considering the entry by the state itself into the market as a purchaser in effect of a potential article of interstate commerce. That's at 426 U.S. 808. So, again, they were considered to be a purchaser. As I've said, in this instance, the judge has completely read out of the law any requirement that there be direct participation by the port in the market. And one other quick point on that is that in terms of the ______. You're suggesting then the port qualifies as the proprietor? The port may well be a proprietor, but it's not a proprietor in the sense of the word or in the sense of the market participant doctrine. Well, I understand what you're saying there. Your Honor, and finally, even if the port was leasing facilities, I would cite the court to the Western Oil case and the Shell Oil case where, again, the ports, the cities in that instance tried to take advantage of the market participant doctrine, and even though they were directly leasing easements for oil companies, the court said the market participant doctrine can't apply because they're sitting astride channels of interstate commerce under sovereign immunity and they can erect barriers to interstate commerce, and we can't give them that broad authority on the market participant doctrine. Well, I'm out of time, and I will have 13 seconds for my rebuttal. Thank you. May it please the Court, I'm Steve Rosenthal here on behalf of the Port of Los Angeles. I would like to reserve five minutes of my time for the environmental interveners represented by NRDC and Melissa Lynn Perella. Let me start by stating that there is, I think, I'm not overstating this, there's literally no evidence in this voluminous record that shows that the port adopted this concession program other than as a proprietor, other than to advance its business goals of fostering and growing a port. That's the only reason they did it. Let me just point out some facts which are of record. The Port of Los Angeles is one of the largest business enterprises, probably one of the five largest business enterprises, does a quarter trillion dollars worth of cargo, 900,000 employees directly and indirectly rely on it, 42 miles. It's also hardly open to dispute. It's a matter of virtually a public record that in the middle of the last decade, it faced huge commercial challenges. What were they? A disproportionate number of the trucks serving that port had air pollution problems. Indeed, 25 percent of the entire air pollution came from trucks coming in and going out of our port. Not only that, it faced huge security risks, and they were security risks the port couldn't deal with because it had no control, zero control over who was coming onto their property, plus huge safety risks. These trucks were disproportionately causing accidents, loss of life. These were all challenges that the port had to meet. Otherwise, it couldn't grow. Not only couldn't it grow, its facilities were deteriorating. As a result, they adopted the clean truck program in order to address these commercial interests. As a result, the district court made a factual finding which they do not challenge, which was that the concession contract provisions were adopted to advance the port's commercial interests in addressing environmental security and safety concerns. Your Honor, they do not attack the factual findings. They make, I think, three legal arguments which we would like to address quickly. First of all, they contend that the F4A here really doesn't have a market participant exception at all. The problem with that is that that's foreclosed by Tauscher and a voluminous number of other decisions which hold that there is a market participant exception, and indeed hold, contrary to what he has contended, that that market participant exception is probably broader in the context of this case because the statute contains language, the force and effect of law language, which Cardinal Towing and Tauscher said invites a market participant exception. Their biggest argument, it seems to me, is the argument that a market participant has to buy or sell products, and that has been rejected by the U.S. Supreme Court. It's been rejected by this court in Tauscher. Tauscher was not a purchasing of towing services. That was a case in which the city said, here's a list of people who you can contract to tow with. It's exactly the same sort of third-party case that we've got here. Lastly, and most importantly, I think Judge Brewster asked about this, about proprietors of land, I would ask the court to look at the Boston Harbor case, which is cited by the district court. There the U.S. Supreme Court describes the doctrine as applying in circumstances where the state is managing its own property in pursuance of its proprietary interests. Lastly, a lot of... Let me... Yes, sir. Let me ask you a question. Even if the court qualifies as a proprietor, even if they do, let's look at the employee driver and off-street parking provisions. It seems to me that those provisions do not qualify as efficient procurement of services. Wouldn't you agree? I disagree, Your Honor. Okay, why? Okay. I expected you would. I was trying to get you... Your Honor, the fact is, let me point... Let me give you what the record is. It seems to me that that is the way it is because the court seeks to affect private parties' conduct. Only on the court. Unrelated to the performance of the contractual obligations. No, Your Honor. No, Your Honor. First of all, the provision isn't regulation. We're only talking about what goes on at the port. If his clients want to use IOOs for any other operation outside the port, that's fine with us. But let me tell you what the record shows. These are findings. Before our program was adopted, we had unreasonably high safety and maintenance violations. We had turnover of drivers who couldn't be credentialed under TWIC. Most importantly, the IOOs couldn't afford the maintenance required to maintain the trucks. The reason this whole thing is critical to us is that if these IOOs have the responsibility of maintaining these trucks, our trucks are going to deteriorate. The fact of the matter is we are dependent upon clean trucks. People who earn minimum wage can't maintain the trucks. Well, that doesn't seem to me to go to the performance of the contractual obligations. And that's where I am. It seems to me that these provisions seek, number one, to increase wages, two, address political concerns about the community, three, they may even address the port's administrative interest in reducing complexity. But I guess I'm still having a tough time how as to that they are related to the performance of the obligation. Your Honor, as I've been trying to explain, the obligation here is to maintain clean trucks and safe trucks. And we're arguing and the findings were that it was motivated by our belief that these employees, that an employee relationship was more likely to produce trucks that were maintained, trucks that drivers who would be secure, a reliable workforce. It all relates, Your Honor. The reliable workforce, the maintenance, all relate to providing services to our port. I would point out to Judge Fletcher, who was on the panel, this court faced this issue in Johnson. It faced exactly the same issue. You had this project labor agreement. You had the plaintiff saying it was political motives. This court said we don't care as long as we find at least a plausible connection with the contract. And let me remind the court what the standard was that was used in that case. Well, I tried to read the standard. Seeks to affect private party's conduct unrelated to the performance of the contractual obligations to the port. Right. That's Johnson, 623 5th 3rd 1026. And that's the reason I'm worried about that. Your Honor, the record is replete. I disagree with you. Frankly, my questions are all advocates. No, I appreciate that. I'm putting you on the spot because it is one that concerns me. It's not necessarily what I'm saying it is. But it seems to me that's a big concern in this particular situation. First of all, that only relates to the employee driver. The maintenance. Employee driver and off street parking. All of those, Your Honor. All of those, Your Honor, relate to our concern about having control and oversight over the trucks and over the drivers. We've had zero control. The off street parking is important because we're concerned about what could happen at night. It's not just off street parking. It has to be in a secure location. We had examples of people putting things onto trucks and then the next morning the truck coming onto our property. But with respect to the employee option, the fact is that it relates to the provision of trucking because what it does is it gives greater control and oversight over the drivers. The only reason, there is no evidence, Your Honor, there is no evidence in this case of any reason other than our attempt to foster the port. I would say that our desire to avoid litigation is present. But that's a normal occurrence for a party, a commercial party that's trying to do its business. We don't want to be sued by the next speakers up here. We simply want to continue to do our business here. But that's a legitimate, Your Honor, commercial desire. Plus, and this is the point that I think you can't forget and was mentioned throughout, we do have an interest in a reliable workforce. And we were facing a problem of independent owner operators disappearing, not having the capacity to provide us with the carriage we need. Let me draw an analogy, if I can, Your Honor. An airport needs a constant supply of cash. I don't want you to get too far involved here because your five minutes is going to be up in just a minute. Because I want you to talk about your idea that you had a motor vehicle safety exception. Yes. And you have that in the face of Castle versus Hayes Freight Airlines. This Court obviously dealt with the Castle issue in the previous decision. And the fact is Castle doesn't apply for a number of reasons. But the most important two reasons are, number one, and this continually gets elided by Mr. Diggs, Castle, by its terms, only applied to interstate truckers. If you read the decision carefully, the State of Illinois was allowed to ban intrastate trucking. What we're talking about in this particular case is overwhelmingly intrastate trucking. In fact, there's a companion case with Castle in which Illinois banned those trucks within the State of Illinois. Just a minute. I understand the evidence is that the federal government continues to issue intrastate transportation registrations or permits enabling the trucking companies to transport the cargo. Along, across the state lines so long as they comply with the regulations. So I guess I'm still having trouble that why Castle wouldn't apply. Let me get to the more fundamental reason. The more fundamental reason is we're not, we are taking no action to deny these people the right to engage in intrastate transportation. We are denying them the right to come onto our property. That was never, ever, ever involved in the Castle case. It is just simply the same as General Motors saying we want green trucks coming onto our property or landlords saying we only want green trucks coming onto our property. We're not, we not only are not limiting their right to engage in intrastate commerce, we demand that they have a registration in order to be able to come onto our property. But coming onto our property is simply to whore the whole question of what was involved in Castle. Castle was a state saying you can't use the public highways of the State of Illinois. Well, here's the problem. Bottom line, if you bar access to the Port of Los Angeles, the largest port in the United States, in my book, and one of only a handful of large commercial deep water ports, and you're going to bar access, I don't know how you can get around that it will seriously disrupt drayage carriers' ability to transport goods from ships and other destinations in and outside of California. As a factual matter, Your Honor. Which is putting it right into where Castle is. Except Castle, all Castle dealt with was not seriously disrupting what it said. Illinois proposed there was prohibiting the trucks from operating on Illinois highways. It didn't deal with that. It's not this case. It's not a case like the railroads in Chicago saying you can't come onto our property. Because nothing in Castle prohibited the railroads in Chicago from saying we don't want you on our property dealing with our terminals on our property. That's a very, very, very different case. We are not telling them what they can or can't do with their registration. We're telling them whether they can come onto our property. If I may, I'd like to leave a little time for my colleagues, but I would point out. Well, I'm the one who got you into that, so I understand. Have I answered your question? You've given me the answer that I wanted to, you know, I'm not saying you necessarily convinced me, but I wanted you to think about it. Thank you. Good morning. My name is Melissa Lynn Perrella. May it please the Court, I represent the Environmental Intervenors, the Natural Resources Defense Council, the Sierra Club, and the Coalition for Clean Air. I'd like to spend my time this morning focused on three issues. One, to address our interest in the case. Judge Brewster, you asked what is the relationship to the environment in this case. I'm going to answer that question for you. Second, I'd like to address why the concession agreement is good for the environment. And third, provide some additional reasons as to why the market participant doctrine applies and in so doing respond to some of the arguments that Mr. Diggs of ATA raised. First, why do you environmentalists care about this case? It was uncontested at trial that over 2 million people who live near the port face greater health risks than those who live elsewhere in the region. The trial court found that the cancer risk for communities close to the port is 60% higher than for communities outside of the region. Ma'am, I don't mean to be disrespectful to this because I'm equally interested in exactly what you're suggesting. But I guess I'm trying to hear, in my view, interpret law as it relates to agreements and whether one should have such an agreement or whether one should not have that agreement because the federal government has come in and preempted it. So we all have, in my book, similar good public policy reasons for doing things that we do, but we're stuck with trying now to decide is this preempted or isn't it not, even given all of these good public interest reasons. Okay, I understand that. Let me start by saying then both Alexandria Scrapp and EMA versus the South Coast Air Quality Management District make very clear that environmental protection is a legally cognizable proprietary motive. And the concession agreement helps the environment in two ways. One, the concession agreement imposes maintenance requirements on LMCs, and the district court found that ongoing maintenance is critical to the port being able to achieve its clean air objectives. Second, the concession agreement's financial capability and employee provisions ensure that those that are performing port drainage can shoulder the costs associated with environmental cleanup. Judge Smith, you raised a concern about the employee provision and the off-street parking provision. And specifically, I think you were concerned that these provisions seek to affect private parties' conduct. I think that's how you phrased it. Your Honor, this case is nothing like the Ninth Circuit. I did say it that way because that's exactly what Johnson says. Right. And that's why I'm trying to see if this meets the standard or if it doesn't. And I want to give you an example of why, despite the fact that the port is not either purchasing or selling drainage services, why they still qualify within the market participant doctrine. Okay. And let me give you an example. This case is nothing like the illegal permitting scheme for tow trucks in Tosher. And there, the court determined that the market participant exception could not apply there because the city had no commercial interest whatsoever in dictating how towing services should be provided for individuals like you and me. We have a very different set of facts here. The port has every interest in dictating how drainage services should be provided. Judge Brewster, I think you hit the nail on the head when you tried to suggest that drainage services are integrated with port operations. We are not dealing with two different spheres of economic activity here. The district court laid out a number of findings of fact on how the drainage service system has been an utter failure for the port, environmentally, on a safety level, and on a security level. And at the end of her near 60-page opinion, she found that the concession agreement was a, quote, business necessity. Those aren't my words. Those were the trial court's words. And for these same reasons, I don't think this court needs to fear that the district court read the market participant doctrine too broadly. I actually agree with ATA. This case is not one in which ‑‑ let me start over again. I agree with ATA that simply being a business and trying to advance your financial interests is not enough for the doctrine to apply. But that is not the case here. The port could not expand for nearly a decade because of the pollution problem emanating from it. The port's not just trying to eke out a bit more profit. Its vitality, in fact, depended on it being able to move forward with its clean truck program. Thank you very much, Your Honor. Thank you. Appreciate your argument. Counsel will give you two minutes. Thank you, Your Honor. As generally, the port is trying to obfuscate the issues bringing up all these safety and security issues. Those issues aren't at issue in this case. They haven't appealed. In the first instance when this injunction, they were appealing, they were defending these actions as safety actions, as falling within the safety exception. The independent contractor ban, the off‑street parking, the court below now found that those don't meet, those fall within the safety exception, and that hasn't been appealed by the port. Now they're trying to dress them up as market participant in that. Isn't that what the court held below, that they are proprietary? They said they were market participant. Yes. There seems to be a concern about regulation. And, again, we don't ‑‑ environmental regulation, regulations involving safety, regulations involving security. If the port has an interest and they do have an interest and this is really not an issue, there's the TWIC finding. All of these things that they laid out, these horrible scenarios, don't exist anymore. They have a drage truck registry.  They know every driver that's on the port. They have security laws. They have truck safety laws. They said they were going to put an inspection station on the port. This isn't about regulation. They can regulate and fulfill all of those goals in normal regulation. In terms of the Toucher case, as they said, the bottom line is this is like the consensual towing in which they tried to, the cities tried to regulate, the consensual tows in terms of the dealings between the vehicle owner and the towing company. And, clearly, in Toucher and in the Cardinal case, they said those are not protected by the market participant doctrine. There is no specific contract. This is not like the Johnson case. This is not like the Harbor case because there were specific contracts, generally a single contract involved. I'd like to just finish up by saying that we believe this court and the port agrees has enough to decide the narrow scope test. We don't believe there's anything narrow about the port's regulation here. It was done for general policy provisions, including workers' wages, et cetera. And as you read the quote from Johnson, it was done outside of contractual to affect the party's conduct. Thank you. Thank you. Very tough case and very well argued. Thank you. Very well argued. We appreciate it. We have had some time to fight through this case, and I really appreciate your arguments. We let you go at each other just a little bit, but we also wanted to test some of these things that have been worrying us, so we appreciate both of that. Case 10-56465, American Trucking Associations v. City of Los Angeles, is now submitted. Thank you very much.
judges: Brewster, Fletcher B. , Smith N. R.